USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/22/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COLETTE D. RAGIN,

                                Plaintiff,

         -against-

RIVERBAY CORPORATION,

                                Defendant.

---

No. 17-cv-3832 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge:

Plaintiff Colette D. Ragin brings this action against her former employer, Defendant Riverbay Corporation ("Riverbay"), alleging violations of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the New York State Human Rights Law ("NYSHRL"), New York Executive Law § 290, et seq. (ECF No. 1.)  Plaintiff alleges that Defendant unlawfully terminated her on the basis of her gender and disability.[1]

Presently before the Court is Defendant's motion for summary judgment dismissing the Complaint in its entirety pursuant to Federal Rule of Civil Procedure 56. (ECF No. 30.)  For the reasons that follow, Defendant's motion is GRANTED, and the case is dismissed.

## BACKGROUND

The following facts are derived from the parties' respective Local Rule 56.1 statements and a review of the record, and are uncontested except where otherwise indicated.

Riverbay, commonly known as "Coop City," is a residential cooperative located in the

---

[1] Plaintiff alleges other instances of discrimination in the Complaint, including with respect to prior requests for reasonable accommodations and a purported demotion.  However, Plaintiff is clear that her claims are premised only on her termination in 2015.  (See Compl. (ECF No.1) ¶¶ 69–72.)

Bronx, New York.  (Def.'s Local Rule 56.1 Statement ("Def. 56.1") (ECF No. 32) ¶ 1; Pl.'s Response to Def. 56.1 ("Pl. 56.1 Resp.") (ECF No. 38) ¶ 1.)  In September 2008, Riverbay hired Plaintiff as its Director of Human Resources.  (Def. 56.1 ¶ 2; Pl. 56.1 Resp. ¶ 2.)  At the time of Plaintiff's hire, Marion Scott Real Estate, Inc. ("MSRE") served as managing agent for Riverbay.  (Def. 56.1 ¶ 3; Pl. 56.1 Resp. ¶ 3.)  From the time of her hire through November 2014, Plaintiff reported to a female assistant general manager named Gail Badger, who was an MSRE employee.  (Def. 56.1 ¶ 4; Pl. 56.1 Resp. ¶ 4.)  In 2009, Plaintiff asked Badger if Plaintiff could be allowed a flexible, four-day workweek as an accommodation to help her manage complications from multiple sclerosis.  (Def. 56.1 ¶ 5; Pl. 56.1 Resp. ¶ 5.)  While Riverbay, through Badger and MSRE, initially refused, Plaintiff was ultimately granted this accommodation after her counsel "threaten[ed] [Riverbay] with legal action."  (Def. 56.1 ¶ 6; Pl. 56.1 Resp. ¶ 6.)  In 2012, Plaintiff requested the additional accommodation of being allowed to arrive at work at 10:30 a.m. rather than 9:30 a.m.  (Def. 56.1 ¶ 7; Pl. 56.1 Resp. ¶ 7.)  MSRE granted Plaintiff's request.  (Def. 56.1 ¶ 8; Pl. 56.1 Resp. ¶ 8.)  Each of these accommodations continued for the duration of Plaintiff's employment.  (Def. 56.1 ¶ 9; Pl. 56.1 Resp. ¶ 9.)

In August 2012, MSRE principal Herb Freeman, with MSRE employees Vernon Cooper and Badger, decided to merge the Riverbay positions of Director of Human Resources and Director of Risk Management.  (Def. 56.1 ¶ 10; Pl. 56.1 Resp. ¶ 10.)  The newly merged position was assigned to Ron Caesar, Riverbay's then-Director of Risk Management, and Plaintiff was reassigned to the position of Director of Organizational Development and Training.  (Def. 56.1 ¶¶ 11–12; Pl. 56.1 Resp. ¶¶ 11–12.)  The reassignment did not affect Plaintiff's salary.  (Def.

56.1 ¶ 13.)[2]

On November 4, 2012, Plaintiff filed a Charge with the U.S. Equal Employment Opportunity Commission ("EEOC") naming Riverbay as Respondent, although her allegations were against Freedman, Cooper, and Badger of MSRE.  (Def. 56.1 ¶ 14; Pl. 56.1 Resp. ¶ 14.)  In her Charge, Plaintiff complained that she was being subject to a litany of adverse employment actions by MSRE on the basis of her gender and disability in violation of Title VII and the ADA. (Def. 56.1 ¶ 15; Pl. 56.1 Resp. ¶ 15.)  On June 26, 2014, the EEOC issued a Dismissal and Notice of Rights informing Plaintiff that she had 90 days to file a lawsuit based on the violations alleged in her Charge.  (Def. 56.1 ¶¶ 16–17; Pl. 56.1 Resp. ¶¶ 16–17.)  Plaintiff did not do so. (Def. 56.1 ¶ 18; Pl. 56.1 Resp. ¶ 18.)  Plaintiff has testified that MSRE's Freedman, Cooper, and Badger were the cause of the difficulties she encountered during her employment with Riverbay during the period when MSRE served as managing agent.  (Def. 56.1 ¶ 25; Pl. 56.1 Resp. ¶ 25.)

In June 2014, Riverbay elected a new Board of Directors and appointed Cleve Taylor as new Board President.  (Def. 56.1 ¶ 19; Pl. 56.1 Resp. ¶ 19.)  In August 2014, Plaintiff was reassigned to the position of Director of Human Resources with a $31,000 salary increase.  (Def. 56.1 ¶¶ 20–21; Pl. 56.1 Resp. ¶¶ 20–21.)  Plaintiff believes that MSRE reassigned her and increased her salary at President Taylor's urging.  (Def. 56.1 ¶ 22; Pl. 56.1 Resp. ¶ 22.)  In addition, at President Taylor's request, Riverbay appointed Plaintiff, along with two other Riverbay Directors, Noel Ellison and Peter Merola, as "Knowledge Assistants" tasked with tracking MSRE and learning as much as possible about MSRE's operations.  (Def. 56.1 ¶ 23; Pl. 56.1 Resp. ¶ 23.)  In November 2014, at President Taylor's urging, Riverbay's Board of

---

[2] Plaintiff insists that the reassignment affected her status because she was "isolated in a newly created position with nebulous job functions."  (Pl. 56.1 Resp. ¶¶ 12–13; Affidavit of Collette D. Ragin ("Ragin Aff.") (ECF No. 39) ¶ 20.)  However, there is no dispute that Plaintiff's salary and title level remained the same.

Directors voted to expel MSRE as managing agent and appoint Ellison and Merola as interim co-general managers of Riverbay.  (Def. 56.1 ¶ 27; Pl. 56.1 Resp. ¶ 27.)  At that point, Ellison became Plaintiff's direct supervisor.  (Def. 56.1 ¶ 28; Pl. 56.1 Resp. ¶ 28.)

In December 2014, Riverbay retained Michael Mauro, Esq., from the law firm Smith, Buss, & Jacobs LLP, to serve as outside counsel for the purpose of conducting an audit of certain employee positions that Riverbay had been treating as exempt from the overtime requirements of the Fair Labor Standards Act ("FLSA") and New York Labor Law ("NYLL").  (Def. 56.1 ¶ 29; Pl. 56.1 Resp. ¶ 29.)  The audit was commenced after Riverbay was sued in a class-action wage and hour lawsuit brought by current and former Riverbay employees seeking damages for, *inter alia*, unpaid overtime.  (Def. 56.1 ¶ 30; Pl. 56.1 Counter-Statement ("Pl. 56.1") (ECF No. 38) ¶ 2.)  Plaintiff assisted Mauro during the audit process.  (Def. 56.1 ¶ 31; Pl. 56.1 Resp. ¶ 31.)  Specifically, she (1) prepared a spreadsheet containing information regarding all Riverbay employees treated as exempt, (2) scheduled and participated in Mauro's interviews of Riverbay's various department heads so that he could obtain information about the exempt positions in each department, and (3) provided Mauro with follow-up and clarifying information regarding the various positions that he was examining.  (Def. 56.1 ¶ 32; Pl. 56.1 Resp. ¶ 31.)

In May 2015, Mauro presented an initial assessment of the positions at issue and recommended that Riverbay reclassify certain positions as "non-exempt" and pay back-pay estimated to be owed to the misclassified workers over the previous six years.  (Def. 56.1 ¶ 34; Pl. 56.1 Resp. ¶ 34.)  After being questioned by Riverbay's directors and leadership, Mauro agreed to reevaluate a number of the employees he had initially recommended to be reclassified as nonexempt.  (Def. 56.1 ¶ 35; Pl. 56.1 Resp. ¶ 35.)

On June 9, 2015, Mauro sent an email (the "June 9th email") to Plaintiff and her

assistant, Kreigh Thomas, in which he advised them that he was changing his recommendation for six employees who he now felt were properly classified as exempt.  (Def. 56.1 ¶ 36; Pl. 56.1 Resp. ¶ 36.)  Plaintiff never acted on this email and did not pass the email along to anyone else to act on.  (Def. 56.1 ¶ 37; Pl. 56.1 Resp. ¶ 37; Pl. 56.1 ¶ 21.)  On June 25, 2015, Plaintiff allowed memos in her name to be distributed which contained back-pay checks for the six employees Mauro had told her were properly classified as exempt and therefore not entitled to back-pay.[3] (Def. 56.1 ¶ 38.)  The improperly issued checks totaled $96,483.  (Def. 56.1 ¶ 39; Pl. 56.1 Resp. ¶ 39.)  Subsequently, on June 30, 2015, Plaintiff sent out emails to all of Riverbay's Department heads notifying them of which of their employees were being reclassified as non-exempt and instructing them on certain protocol for how to treat these newly non-exempt employees.  (Def. 56.1 ¶ 40; Pl. 56.1 Resp. ¶ 40.)  The emails identified all six of the employees in Mauro's email as non-exempt.  (Def. 56.1 ¶ 41; Pl. 56.1 Resp. ¶ 41.)

In late July 2015, some directors began inquiring as to why certain employees who they believed were properly classified as exempt were still being classified as non-exempt.  (Def. 56.1 ¶ 42; Pl. 56.1 Resp. ¶ 42.)  Riverbay's in-house counsel, Michael Munns, followed up with Mauro.  Mauro told him that he had informed Plaintiff in early June that six of the employees in question were properly classified as exempt.  (Def. 56.1 ¶ 43; Pl. 56.1 Resp. ¶ 43.)  Mauro forwarded the June 9th email to Munns.  (Def. 56.1 ¶ 44; Pl. 56.1 Resp. ¶ 44.)  Realizing that it had paid nearly $100,000 out erroneously, Riverbay made efforts to recoup the funds.  (Def. 56.1 ¶ 45.)[4]  Over the next few weeks, Plaintiff and Munns met with all six of the misclassified

---

[3] Plaintiff denies, without citing to any admissible evidence, that she "helped draft the memo."  (Pl. 56.1 Resp. ¶ 38.)

[4] The parties dispute the quality of the attempts made to recoup the funds.  Specifically, Plaintiff characterizes Riverbay's efforts as "meager," emphasizing the fact that other Riverbay directors including Merola did not know any details about them.  (Pl. 56.1 ¶¶ 106–16.)  However, the parties do not dispute the actual steps that were taken to recoup the funds, or that Riverbay was only partially successful in doing so.

employees, explained the error, and asked them to repay the money they had been erroneously paid.  (Def. 56.1 ¶ 46; Pl. 56.1 Resp. ¶ 46.)  A number of employees refused to comply with Plaintiff's request.  (*Id.*)

On August 27, 2015, Ellison notified Plaintiff that her employment was being terminated as a result of her failure to follow written directives from Mauro regarding the classification of six Riverbay employees, which resulted in those employees being issued back-pay checks in the aggregate amount of $96,483.  (Affirmation of Joseph A. Saccomano, Jr. ("Saccomano Aff.") (ECF No. 33) Ex. 11 ("Termination Letter").)  It was Ellison who made the decision to terminate Plaintiff.  (Def. 56.1 ¶ 48; Pl. 56.1 Resp. ¶ 48.)  Ellison appointed Plaintiff's assistant, Kreigh Thomas, to fill Plaintiff's role on an unofficial basis while Ellison searched for Plaintiff's replacement.  (Def. 56.1 ¶ 51; Pl. 56.1 Resp. ¶ 51.)  Thomas is male and non-disabled.  Although Thomas had also received the June 9th email, Ellison testified that he did not fault Thomas because Plaintiff was Thomas' boss and was tasked with leading the Human Resources Department's role in the reclassification project, so it was Plaintiff's responsibility to make sure Mauro's advice was acted upon.  (Def. 56.1 ¶ 50; Pl. 56.1 Resp. ¶ 50.)  Ultimately, Ellison replaced Plaintiff with Inelle Cooper, a non-disabled woman, as Director of Human Resources.  (Def. 56.1 ¶ 53; Pl. 56.1 Resp. ¶ 53.)

Plaintiff subsequently filed a Charge with the EEOC alleging sex and disability discrimination against Riverbay arising from her termination.  (Compl. (ECF No. 1) Ex. A.)  On or about February 27, 2017, the EEOC issued a Notice of Right to Sue to Plaintiff.  (*Id.* Ex. B.)  This action ensued.

**LEGAL STANDARD**

Summary judgment is appropriate if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013).

A court should grant summary judgment when a party who bears the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). " In such a situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.* at 323 (internal quotation marks omitted).

In deciding a motion for summary judgment, the Court must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted).  However, the nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted).  Further, "[s]tatements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see Holcomb v. Iona Coll.,* 521 F.3d 130, 137 (2d Cir.2008) ("Even in the discrimination context ... a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment.").

**DISCUSSION**

Riverbay states that it is entitled to summary judgment dismissing Plaintiff's sex

discrimination claims under Title VII and the NYSHRL, as well as Plaintiff's disability

discrimination claims under the ADA and the NYSHRL.  For the following reasons, the Court

agrees.

**I.      Title VII Sex Discrimination Claim**

Title VII provides that an employer cannot discriminate against "any individual" based on

that individual's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a).  To

establish a *prima facie* case of discrimination under Title VII, a plaintiff must prove that (1) she

is a member of a protected class; (2) she is qualified for the position held; (3) she suffered an

adverse employment action; and (4) the adverse employment action occurred under

circumstances giving rise to an inference of discrimination.  *Stratton v. Department for the Aging*

*for City of New York*, 132 F.3d 869, 878 (2d Cir. 1997) (citing *McDonnell Douglas Corp. v.*

*Green*, 411 U.S. 792, 802 (1973)).  To establish an inference of discrimination, a plaintiff must

prove that an adverse employment action was taken against her "because of discriminatory

animus on the part of [her] employer." *See Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir.

1999).  For Title VII discrimination claims based on disparate treatment, a plaintiff must also

show that "she was similarly situated in all material respects to the individuals with whom she

seeks to compare herself."  *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000) ("When

considering whether a plaintiff has raised an inference of discrimination by showing that she was

subjected to disparate treatment, we have said that the plaintiff must show she was 'similarly

situated in all material respects 'to the individuals with whom she seeks to compare herself.")

On a motion for summary judgment in a case wherein a plaintiff asserts that the

employer's decision was a pretext for discrimination, the plaintiff's discrimination claim is subject to the *McDonnell Douglas* burden-shifting standard. *Ya-Chen Chen v. City Univ. of New York*, 805 F.3d 59, 70 (2d Cir. 2015). Under this framework, a plaintiff bears the initial burden of demonstrating her *prima facie* case. *Cortes v. MTA New York Transit*, 802 F.3d 226, 231 (2d Cir. 2015). " The burden of proof that must be met to permit an employment-discrimination plaintiff to survive a summary judgment motion at the *prima facie* stage is *de minim[i]s.*" *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d Cir. 1994) (internal quotation marks omitted). Once a plaintiff demonstrates a *prima facie* case, a "presumption arises that the employer unlawfully discriminated." *Roge v. NYP Holdings, Inc.*, 257 F.3d 164, 168 (2d Cir. 2001). The burden then "shifts to the employer to give a legitimate, non-discriminatory reason for its actions." *McDonnell Douglas Corp.*, 411 U.S. at 802. If the employer articulates a non-discriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 510–11 (1993).

The "final and ultimate burden" then returns to the plaintiff to demonstrate that "defendant's reason is in fact pretext for unlawful discrimination." *See Cortes*, 802 F.3d at 231. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (internal quotation marks omitted) (citation omitted). Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that" an impermissible reason was a 'motivating factor, 'without proving that the employer's proffered explanation' played no role in its conduct."

*Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (quoting *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 120 (2d Cir.1997)). "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

Riverbay does not dispute that Plaintiff, a woman, is a member of a protected class under Title VII and was qualified for her position.  Nor does Riverbay contest that Plaintiff suffered an adverse employment action when she was terminated on August 27, 2015.  However, Riverbay contends that Plaintiff has not presented evidence sufficient to satisfy the fourth prong of her *prima facie* sex discrimination claim.  Further, Riverbay states that even if Plaintiff has proven her *prima facie* case, Riverbay has supplied a legitimate, non-discriminatory reason for her termination, and Plaintiff has not demonstrated that the proposed reason is pretext for discrimination.  Accordingly, this Court considers whether a genuine issue of material fact exists with respect to whether the circumstances surrounding Plaintiff's termination give rise to an inference of discrimination, and whether the parties have met their respective burdens at the second and third stage of the *McDonnell Douglas* analysis.

### a.  Inference of Discrimination

In her memorandum in opposition to Riverbay's motion, Plaintiff supports her *prima facie* sex discrimination claim with a single fact: she was terminated for her failure to act on an email and subsequently replaced by her male assistant, who had received the same email and also failed to act on it.  (Pl.'s Mem. in Opp. to Def.'s Mot. to Dismiss ("Pl. Opp.") (ECF No. 37) at 7.)  Each of these employment decisions was made by Ellison, an interim co-general manager of Riverbay.  (Saccomano Aff. Ex. 5 ("Ellison Dep.") at 51, 92–94; Termination Letter; Affirmation of Michael Sussman ("Sussman Aff.") (ECF No. 38) Ex. 11 ("Merola Dep.") at 46.)

Admittedly, Plaintiff's assistant was not formally given Plaintiff's title; Ellison hired a permanent replacement, who was a woman, fourteen months later.  (*Id.* at 92–96; Sussman Aff. Ex. 16 ("Munns Dep.") at 173.)

It is well-settled that "the mere fact that a plaintiff was replaced by someone outside the protected class will suffice for the required inference of discrimination at the *prima facie* stage of the Title VII analysis."  *Zimmermann v. Assocs. First Capital Corp.*, 251 F.3d 376, 381 (2d Cir. 2001); *see Benedith v. Malverne Union Free Sch. Dist.*, 38 F. Supp. 3d 286, 318 (E.D.N.Y. 2014); *Dabney v. Christmas Tree Shops*, 958 F. Supp. 2d 439, 451 (S.D.N.Y. 2013); *Thomas v. iStar Fin., Inc.*, 438 F. Supp. 2d 348, 359 (S.D.N.Y. 2006).  This comports with the general rule in this Circuit that discrimination can be inferred from evidence that the decision-maker showed a "preference for a person not of the protected class."  *James v. New York Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000).

Riverbay attempts to distinguish the facts of this case by emphasizing that Plaintiff was eventually replaced by a woman and down-playing the role of Plaintiff's assistant in carrying out Plaintiff's former duties.  Riverbay opines that Kreigh Thomas "did not replace Plaintiff" because he did not have an "interim" title and "was not a candidate to be the Director of Human Resources."  (Def.'s Mem. in Further Support of Mot. to Dismiss ("Def. Reply") (ECF No. 34) at 5.)  Instead, Thomas "fill[ed] the role of liaison between the Human Resources Department and Mr. Ellison" while Ellison searched for Plaintiff's successor.  (*Id.*; Ellison Dep. at 92.)

For purposes of Plaintiff's limited burden on this motion, this distinction is of little importance.  Thomas covered the responsibilities of Plaintiff's position in some capacity for over a year before the position was formally offered to a woman.  (*See* Munns Dep. at 173 (agreeing the Thomas was "acting director" for the period until Cooper was hired).)  In fact, Ellison

11

testified that Thomas was chosen precisely because of his familiarity with Plaintiff's work. (Ellison Dep. at 94.)  Thus, Plaintiff has demonstrated that she was constructively replaced, albeit temporarily, by a man.

The fact that Plaintiff's position was permanently filled by a woman approximately one year after her termination does mitigate the strength of any inference of discrimination that might be drawn from the fact that Plaintiff was temporarily replaced by a man.  Nonetheless, for purposes of this motion, Plaintiff has met her *de minimis* burden of establishing an inference of discrimination in the circumstances surrounding her discharge.  *See Francis v. Elmsford Sch. Dist.*, 263 F. App'x 175, 177 (2d Cir. 2008) (plaintiff's temporary replacement by a younger employee supported an inference of discrimination on the basis of age); *Morris v. Charter One Bank, F.S.B.*, 275 F. Supp. 2d 249, 256 (N.D.N.Y. 2003) (same).

**b.  Legitimate, Non-Discriminatory Reason for Termination**

Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing "reasons for its actions which, *if believed by the trier of fact*, would support a finding that unlawful discrimination was not the cause of the employment action." *Chambers*, 43 F.3d at 38 (emphasis in original). " The employer need not *persuade* the court that it was motivated by the reason it provides; rather, it must simply articulate an explanation that, if true, would connote lawful behavior." *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (emphasis in original).

Riverbay has met its burden.  Specifically, Riverbay asserts that Plaintiff was terminated for failing to act on Mauro's June 9th email and thereby facilitating the erroneous payment of almost $100,000 to Riverbay employees properly classified as exempt.  (*See* Termination Letter.)

The burden therefore shifts back to Plaintiff to offer evidence that Riverbay's proffered reason was merely a pretext for unlawful discrimination.

### c. Pretext

Plaintiff does not dispute that she received the June 9th email and took no action in response to Mauro's recommended re-categorization of several Riverbay employees.  (*See* Ragin Aff. ¶ 6; Saccomano Aff. Ex. 3 ("Ragin Dep.") at 139–42.)  Nor does Plaintiff deny that check memoranda dated June 25, 2015, providing back-pay to all of those employees were distributed in her name shortly thereafter.  (*See* Sussman Aff. Ex. 3 (email from Thomas to Mauro, copying Plaintiff, including memo template in Plaintiff's name); Ragin Dep. at 145 (blaming Thomas for preparing and sending out the memoranda and insisting Plaintiff "didn't know anything about it").)  Plaintiff also concedes that she sent a series of internal emails to Riverbay Department heads telling them that those employees should be classified as non-exempt going forward. (Ragin Aff. ¶ 8; Saccomano Aff. Ex. 12.)  Since she is unable to directly challenge the truth of the events preceding her discharge, Plaintiff raises a series of arguments seeking to disclaim responsibility for those events, minimize the consequences of her omissions, and insinuate that she was treated more harshly than her male colleagues for allegedly comparable behavior.  The Court considers each of these arguments in turn.

First, Plaintiff claims that the reason for her discharge was fabricated because she was never expressly directed to do anything with the information provided in the June 9th email, either by Mauro or anyone else at Riverbay.  (Pl.'s Opp. at 7.)  Rather, Plaintiff testified that the email, along with all other emails Mauro might have sent her during the reclassification project, "was an FYI."  (Ragin Dep. at 141–42.)  She further stated that she "probably opened the email and closed it back up" because she was "juggling 50 million balls" at the time.  (*Id.*)

13

While the June 9th email does not give detailed instructions to Plaintiff on how precisely she should proceed, it is disingenuous to dismiss it as an "FYI" email.  The June 9th email, which was addressed only to Plaintiff and her assistant, contained Mauro's "findings on the most recent round of interviews" with Riverbay personnel.  (Sussman Aff. Ex. 2.)  Plaintiff was present at Mauro's interviews, understood at the time that Mauro's project was a "reclassification of employees to determine if they were properly classified exempt versus non-exempt" and had exchanged information with Mauro to further the project on numerous prior occasions.  (*See* Ragin Dep. at 136–39, 142; Sussman Aff. Ex. 2 (June 9th email telling Plaintiff that Mauro needed to discuss an employee's status with her).)  Even if Plaintiff did view the June 9th email as purely informational, and not requiring immediate action on her part, a basic awareness of the email's contents would have alerted her to the mistakes in the check memoranda and her subsequent internal emails to Riverbay Department heads.

Rather than concede any of the foregoing, Plaintiff attempts to distance herself from the entire reclassification project, suggesting that because of her lack of involvement she had no reason to believe the information in the June 9th email meant anything important.  Plaintiff states that no one at Riverbay directed her to assist Mauro and that the audit was "totally a disorganized project," "going helter skelter, completely disorganized" and with no procedure for funneling information to the appropriate people.  (Ragin Dep. at 136, 140; *see* Ragin Aff. ¶¶ 3, 21.) Plaintiff's characterization of the level of her involvement in the reclassification project is in contrast to Mauro's representation of her as his "point of contact and kind of a conduit of information" at Riverbay, and Ellison's testimony that Mauro reported to Plaintiff "most of the time."  (Sussman Aff. Ex. 1 ("Mauro Dep.") at 18; Ellison Dep. at 23.)

However, Plaintiff's minimization of her role does not create an issue of fact because it

remains undisputed that she did, in fact, assist in the reclassification project.  Plaintiff attended employee interviews with Mauro and corresponded with him to provide information relevant to the reclassification of employees.  (*See* Ragin Dep. at 136–39, 142; Pl. 56.1 Resp. ¶ 31; Pl. 56.1 ¶ 8 (admitting that when Mauro sought information from Riverbay, he typically did so through Plaintiff).)  Plaintiff cannot paint herself as an unsophisticated or out-of-the-loop observer to the project when she was plainly familiar with Mauro's work and facilitated the exchange of information between Riverbay and Mauro by, *inter alia*, providing him with employee spreadsheets and clarifying information about employees after their interviews.  (*Id.*)  In short, Plaintiff's reliance on semantics and technicalities would not sway a reasonable juror, who would rightly understand the importance of the contents of the June 9th email and assume Plaintiff, an experienced professional and the Director of Human Resources, did too.

Furthermore, even if reasonable minds might disagree as to whether termination was the proper punishment for Plaintiff's failure to, at the very least, follow up on the June 9th email before allowing check memoranda to be distributed in her name, there is no basis for finding that such failure was mere pretext for sex discrimination.  "It is not a court's role to second-guess an employer's personnel decisions, even if foolish, so long as they are non-discriminatory."  *Greene v. Brentwood Union Free Sch. Dist.*, 966 F. Supp. 2d 131, 156 (E.D.N.Y. 2013), *aff'd*, 576 F. App'x 39 (2d Cir. 2014).

Plaintiff next suggests that several facts revealed by Ellison at his deposition indicate that he fabricated his reason for terminating her.  Specifically, Plaintiff points out that Ellison (1) testified he did not see the June 9th email prior to terminating Plaintiff, (2) claimed Merola and Munns supported his decision, even though they testified that no one sought their opinions, and (3) referenced a prior incident as first prompting him to consider Plaintiff's termination.  (Pl.'s

Opp. at 7–8.)  As to the first, it is irrelevant that Ellison did not physically see the June 9th email.

Ellison testified that he was aware of the email's existence because in-house counsel, who had

seen the email, told him about it.  (Ellison Dep. at 52–53.)  He also knew at the time of Plaintiff's

termination that Plaintiff's failure to act on the email had cost Riverbay financial loss.  (*Id.* at

54.)  His decision to terminate Plaintiff based on the foregoing is memorialized in his written

notice of termination.  (*See* Termination Letter.)  Moreover, there is no dispute that the June 9th

email does in fact exist, and that Plaintiff failed to act on it, in accordance with the language of

Ellison's written notice.

It is similarly unimportant that Merola and Munns did not recall agreeing with Ellison's

decision to terminate Plaintiff beforehand.  Ellison has stated, even if he recalls soliciting input

from others, that the decision was his.  (Ellison Dep. at 51.)  An issue of fact as to whether

Ellison actually sought Merola and Munns' approval does not cast doubt on Ellison's stated basis

for that decision.

The third issue raised by Plaintiff relates to an incident several months before Plaintiff's

termination wherein Ellison stated he heard Plaintiff pray to God to kill the children of some of

her colleagues, whom she called her "enemies."  (Sussman Aff. Ex. 15 ("Ellison Dep.") at 60–

61.)  As a result of this incident, Ellison thought Plaintiff had "reached a point [where] [he]

couldn't trust her judgment."  (*Id.*)  Plaintiff does not merely suggest that the proffered reason for

her termination was pretext for this incident.  Indeed, doing so would not help Plaintiff because

the incident would itself provide a legitimate, non-discriminatory reason for firing her.  Rather,

Plaintiff states that both the June 9th email and this incident, which she maintains was fabricated,

(Ragin Aff. ¶ 15), were pretext for discrimination.  (Pl. Opp. at 8.)  This strikes the Court as a

rather transparent attempt to substitute for the uncontested facts surrounding the June 9th email

16

an incident that Plaintiff can deny ever happened, without any further explanation. Ultimately, Plaintiff's self-serving argument does nothing to aid Plaintiff in meeting her burden of providing evidence sufficient to support a rational finding that she was actually terminated because of her sex.

Next, Plaintiff attempts to shift blame for her omissions and nonfeasance in several alternative directions. First, Plaintiff suggests that her assistant should bear responsibility for the improper payment of Riverbay funds. Plaintiff avers that Thomas was the person who actually prepared the check memoranda in her name, that Thomas was also a recipient of the June 9th email, and that Thomas was "as involved, if not more involved" than she was in "dealing with Mauro's recommendations." (Ragin Aff. ¶¶ 7, 11; Ragin Dep. at 145; Sussman Aff. Ex. 2.) At the same time, Plaintiff readily acknowledges that Thomas was her assistant and a junior member of the Human Resources Department, of which she was head. (Ragin Aff. ¶¶ 7, 11.) Ellison explained that he did not fault Thomas for any nonfeasance precisely because of his subordinate relationship to Plaintiff. (*See* Ellison Dep. at 37–38 (noting that Thomas would have assumed his boss would raise any issue arising from the June 9th email because that is how the Human Resources Department was run at the time).) Next, Plaintiff points at Mauro for failing to correct the emails she circulated on June 30, 2015, which misclassified the individuals named in the June 9th email as non-exempt. (Ragin Aff. ¶ 8.) Finally, Plaintiff casts blame in the direction of other Riverbay Department heads. For example, Plaintiff insinuates that the head of the Payroll Department was responsible for any overpayment made because they were tasked with actually issuing the checks that were provided to the misclassified employees. (*See* Pl. 56.1 ¶¶ 15–16, 26; Ragin Dep. at 142–43 (insisting that Plaintiff "was not involved with money at all" and "didn't even have knowledge that the money was dispersed").)

As to Thomas, any reasonable juror understands that leadership positions are typically accompanied by greater levels of responsibility, not only for an employee's own work, but also for that of her subordinates.  Even if Thomas were blameworthy in some regard, it remains undisputed that Plaintiff received the same June 9th email, failed to act on it, and then permitted the circulation of check memoranda in her own name that ignored the information provided in the June 9th email.  It was Plaintiff and not Thomas who then sent a series of internal emails misclassifying the Riverbay employees listed in the June 9th email as non-exempt.   Thomas' involvement does not relieve Plaintiff of her responsibility for the foregoing.  Similarly, while Mauro may have been in a position to correct some of Plaintiff's oversights, Plaintiff remains responsible for her own undisputed role in committing those oversights in the first place.[5]

Plaintiff's arguments with regard to the culpability of other Riverbay Directors are no more persuasive.  As discussed above, it is clear that Plaintiff was substantially involved in assisting with the reclassification project.  Moreover, only Plaintiff and her assistant received the June 9th email.  Based on the record before the Court, Plaintiff was the only senior Riverbay employee who had the information to prevent the overpayments but failed to acknowledge it or pass it along to other senior management staff in any manner.  That Riverbay elected to terminate Plaintiff rather than other employees whose actions were facilitated by her nonfeasance does not provide a sound basis for finding that the reason for Plaintiff's termination was pretext for discrimination.

Plaintiff next attacks Riverbay's proffered reason for her discharge by attempting to minimize the impact of her conduct.  Plaintiff makes much of the fact that Riverbay settled the class action that prompted the reclassification project for $6,200,000, but never investigated its

---

[5] To the extent Plaintiff also seeks to set out a disparate treatment argument in relation to Thomas and Mauro, the Court addresses such argument *infra* at 22.

personnel to determine who was to blame for the mis-classifications that caused the class action in the first place.  (Ragin Aff. ¶ 2; Munns Dep. at 138.)  Plaintiff also states that Riverbay's "leading executives made no effort to recoup the $96,000 it claims to have lost as a result of [P]laintiff's failure to follow Mauro's directive."  (Pl. Opp. at 8.)  Essentially, Plaintiff hopes that by trivializing the sum lost as a consequence of her omissions, she can convince a reasonable jury to "question whether the [D]efendant cared at all about this matter."  (*Id.*)

Plaintiff's own testimony undercuts half of her argument.  She has admitted that following the disbursement of the $96,000, she was asked to approach the misclassified employees and ask them to pay the money back.  (Ragin Dep. at 143–45.)  At these meetings, Plaintiff was accompanied by Munns, who subsequently briefed Ellison on what had transpired.  (*Id.*; Munns Dep. at 42–45, 47.)  It is further undisputed that Riverbay solicited and received guidance from Mauro on the proper method to recoup the money.  (Sussman Aff. Exs. 2, 13.)  These facts plainly bely Plaintiff's assertion that "no effort" was made to recover what was lost.

As to Riverbay's $6,200,000 settlement, Plaintiff's suggestion that the failure to investigate and discipline whomever was responsible for the misclassification of the employees who brought the lawsuit indicates that Riverbay was unconcerned about the sum does not necessarily follow.  Moreover, even if Plaintiff were to succeed in persuading a jury that $96,000 was not a large sum for Riverbay, that would not create a basis for a finding that her termination was pretext for discrimination.  Although "discharging [P]laintiff on the basis of so trivial a sum may seem somewhat rigid," Title VII does not "impose liability for being overly rigid or even harsh."  *Fierro v. Saks Fifth Ave.*, 13 F. Supp. 2d 481, 483 (S.D.N.Y. 1998).

Finally, Plaintiff attempts to demonstrate pretext by arguing that other Riverbay employees who were members of a non-protected class were not subject to termination for

violating Riverbay policies.  Plaintiff identifies the following instances involving four male employees, at least three of whom were Directors, and three of whom were non-disabled, in support of her assertion:

- In the summer of 2015, Donovan Plumber, Riverbay's Director of Buildings and Grounds, allowed an untrained seasonal employee to operate a lawnmower in contravention of agency policy.  The employee severed three fingers while operating the lawnmower.  (Ragin Aff. ¶ 17.)

- At an unspecified time, Anthony Rasuelo, Director of Construction, failed to ensure timely completion of critical repairs, imperiling a loan Riverbay had from Wells Fargo.  (*Id.*)

- At an unspecified time, Edgar Perez, Director of Restoration, authorized payment to a vendor despite the vendor's failure to complete a painting job.  (*Id.*)

- At an unspecified time, Mark Gordon, who "ran the Extermination Department" at Riverbay, allegedly threw objects at an employee and violated rules and laws governing the disposal of animals.  Plaintiff recommended Gordon's termination but Ellison took no action against him.  (*Id.*)

In her memorandum in opposition to Riverbay's motion, Plaintiff did not invoke these examples of allegedly disparate treatment as a means of establishing her *prima facie* case of discrimination.  However, disparate treatment may also be used to demonstrate pretext.  *See Graham*, 230 F.3d at 43; *Dowrich v. Aramark Healthcare Support Servs., Inc.*, No. 03 Civ. 2392, 2007 WL 2572122, at *8 (E.D.N.Y. Sept. 4, 2007).  The question here is whether a reasonable juror could find on these facts that there was disparate treatment in Riverbay's disciplining of Plaintiff when compared to similarly situated employees.  *See Graham*, 230 F.3d at 43.

The facts required to demonstrate similarity in "all material respects" vary from case to case. The relevant inquiry generally addresses whether the plaintiff and the putative comparator were "subject to the same performance evaluation and discipline standards" and "engaged in comparable conduct." *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 493–94 (2d Cir. 2010) (quoting *Graham*, 230 F.3d at 40). A plaintiff need not show that she and the putative comparator are identical, but rather that there is a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." *Id.* at 494 (quoting *Graham*, 230 F.3d at 40).

The evidence produced by Plaintiff does not meet this standard. As a preliminary matter, Plaintiff does not identify in any detail the disciplinary standards she and her colleagues were subjected to. Even assuming that four of the five comparators were held to the same standards as her, because all were Directors at Riverbay, their conduct varies greatly from Plaintiff's alleged conduct. Plaintiff failed to act on an email and ultimately cost Riverbay $96,483. The putative male comparators engaged in a variety of misconduct, some but not all of which likely cost Riverbay money. Nowhere in the record is it revealed whether or how much Riverbay lost as a consequence of the comparators' actions. On these facts, no reasonable juror could find that Plaintiff was similarly situated to the proposed comparators.

Likewise, to the extent Plaintiff's factual assertions with regard to Thomas' and Mauro's culpability for Riverbay's overpayments can also be construed as disparate treatment arguments, neither of them is similarly situated with Plaintiff. As discussed herein, Thomas was Plaintiff's assistant, and Mauro was outside counsel. Neither of them would have been properly held to the same standards as Plaintiff, a Director of Riverbay.

In sum, Plaintiff fails to produce sufficient evidence to support a rational finding that the legitimate, non-discriminatory reason proffered by Riverbay for her termination was false, and

that more likely than not sex discrimination was the real reason for her termination.  Nor does

Plaintiff show that impermissible sex discrimination was a motivating factor in her termination.

For those reasons, Riverbay is entitled to summary judgment in its favor on Plaintiff's Title VII

claim.

## II.     ADA Claim

The ADA provides that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to job application procedures, the hiring,

advancement, or discharge of employees, employee compensation, job training, and other terms,

conditions, and privileges of employment."  42 U.S.C. § 12112(a).

To establish a *prima facie* case of disability discrimination under the ADA, a plaintiff

must demonstrate by a preponderance of the evidence that (1) his or her employer is subject to

the ADA; (2) he or she was disabled within the meaning of the ADA; (3) he or she was

otherwise qualified to perform the essential functions of the job, with or without reasonable

accommodation; and (4) he or she suffered an adverse employment action because of the

disability.  *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (quoting *Giordano v.

City of New York*, 274 F.3d 740, 747 (2d Cir. 2001)).

Plaintiff's ADA claim is subject to the same *McDonell Douglas* burden-shifting

framework as her Title VII claim.  *Wagner v. Cty. of Nassau*, No. 11 Civ. 1613, 2014 WL

3489747, at *4 (E.D.N.Y. July 11, 2014).  As noted in the Title VII discussion above, under this

framework, a plaintiff must establish a *prima facie* case of disability discrimination, after which

the burden shifts to the employer to offer, through the introduction of admissible evidence, a

legitimate non-discriminatory reason for the adverse employment action.  *Sista*, 445 F.3d at 169.

Assuming the employer is able to provide such a reason, "the burden shifts back to the plaintiff to

demonstrate by competent evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.'" *Dorgan v. Suffolk Cty. Cmty. Coll.*, No. 12 Civ. 0330, 2014 WL 3858395, at *6 (E.D.N.Y. Aug. 4, 2014) (citing *Patterson v. Cnty. of Oneida, N. Y.,* 375 F.3d 206, 221 (2d Cir. 2004)).  Unlike Title VII plaintiffs, ADA plaintiffs are required to demonstrate that the defendant's stated reason was false and that "but-for" the plaintiff's membership in the protected class, her employment would not have been terminated. *Natofsky v. City of New York*, 921 F.3d 337, 348 (2d Cir. 2019).  Put differently, discrimination cannot merely be a motivating factor in an ADA plaintiff's termination; it must be the but-for cause.

The facts presented by Plaintiff in support of her ADA claim are nearly identical to those offered in support of her Title VII claim.  The parties' respective arguments in favor of and against summary judgment on the ADA claim likewise mirror their Title VII arguments. Accordingly, most of the Court's Title VII analysis is applicable here, and the Court will not repeat its rationale in detail except where a previously unaddressed fact or argument may be relevant.

Riverbay does not dispute that Plaintiff has adequately demonstrated that she is disabled within the meaning of the ADA, that she was qualified to perform her job with the reasonable accommodations she had been granted, and that she suffered an adverse employment action. Moreover, the record establishes that Plaintiff was replaced by a non-disabled individual.  This would remain true even had the Court not rejected Riverbay's argument that Thomas did not replace Plaintiff, as there is no evidence that Plaintiff's permanent replacement was disabled. Thus, Plaintiff produces evidence that could give rise to an inference of discrimination.  She

meets her limited burden of establishing a *prima facie* case of disability discrimination under the ADA.

In response, Riverbay provides a legitimate, non-discriminatory reason for Plaintiff's termination, shifting the burden to Plaintiff to show that the stated reason was false, and that her disability was the but-for cause of her termination. To the extent Plaintiff raises the same arguments as she did in support of her Title VII claim, the Court rejects those arguments for the reasons already discussed. The only noteworthy addition to those arguments is Plaintiff's reference to her difficulties in obtaining reasonable accommodations for her disability earlier in her employment with Riverbay. (*See* Ragin Aff. ¶ 19.) Plaintiff admits that these difficulties arose in 2009 in connection with MSRE employees who no longer manage Riverbay. (*See* Ragin Dep. at 71–87.) There is no basis for attributing any of the alleged biases of these former employees to Ellison, the manager who actually made the decision to terminate Plaintiff. Moreover, after obtaining a reasonable accommodation in 2009, Plaintiff was granted a second accommodation in 2012, had her salary increased in 2014, and expressed satisfaction with a 2012 change in Riverbay leadership. (*See id.* at 106–08, 122–23, 123–25, 216–18.) In view of these facts, Plaintiff's assertion that she had to threaten legal action to obtain a reasonable accommodation six years prior to her termination does not constitute competent evidence that the proffered basis for her termination was false. Nor could a rational juror find that Plaintiff's disability constituted a real reason for her termination, let alone its but-for cause.

Since Plaintiff fails to produce any evidence sufficient to demonstrate that Riverbay's stated reason for discharging her was false or that disability discrimination was the reason for her termination, Riverbay is entitled to summary judgment in its favor on Plaintiff's ADA claim.

III.    **NYSHRL Claims**

Before the Court assesses the viability of Plaintiff's state-law claims, it must first determine whether to exercise supplemental jurisdiction over those claims, given that it has dismissed all of Plaintiff's federal claims.  The Court finds that the exercise of supplemental jurisdiction over Plaintiff's state claims is warranted given that the federal and state claims arise under an identical set of facts and the values of judicial economy, convenience, fairness, and comity weigh in favor of jurisdiction.  *See* 28 U.S.C. § 1367(a); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988); *see also Langella v. Mahopac Central Sch. Dist.*, No. 18 Civ. 10023, 2020 WL 2836760, at *14 (S.D.N.Y. May 31, 2020) (because standards for deciding federal discrimination claims including ADA claims were identical to NYSHRL standards, "deciding the NYSHRL claims would not require an investment of additional judicial resources, and there would be no comity issues triggered"); *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 413 (S.D.N.Y. 2014) (same).  The Court thus turns to the merits of Plaintiff's state law claims.

The Second Circuit has held that "claims brought under New York State's Human Rights Law are analytically identical to claims brought under Title VII." *Torres v. Pisano*, 116 F.3d 625, 629 n.1 (2d Cir. 1997); *see Rojas v. Roman Catholic Diocese of Rochester*, 660 F.3d 98, 107 n.10 (2d Cir. 2011); *Salomon v. Our Lady of Victory Hosp.*, 514 F3d 217, 226 n.9 (2d Cir. 2008).  Moreover, "the scope of the disability discrimination provisions of [the NYSHRL] are similar to those of the [ADA]," *Camarillo v. Carrols Corp.*, 518 F.3d 153, 158 (2d Cir. 2008) (quotation marks omitted), and "the legal standards for discrimination claims under the ADA and the NYSHRL are essentially the same," *Murtha v. N.Y.S. Gaming Commission*, No. 17 Civ.

10040, 2019 WL 4450687, at *16 (S.D.N.Y. Sept. 17, 2019).[6]  As a result, the Court's analysis regarding Plaintiff's federal claims applies with equal force to his NYSHRL claims.  Because Plaintiff's Title VII and ADA claims were deficient, dismissal of Plaintiff's NYSHRL claims against the Riverbay is plainly warranted.

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is GRANTED in its entirety.  The Clerk of the Court is respectfully directed to enter judgment in Defendant's favor, terminate the motion at ECF No. 30, and close the case.

Dated:    June 22, 2020                                SO ORDERED:
          White Plains, New York

                                                       NELSON S. ROMÁN
                                                       United States District Judge

---

[6] However, the NYSHRL has been interpreted to endorse a broader definition of "disability" than the ADA.  *See Rodal v. Anesthesia Group of Onondaga, P.C.*, 369 F.3d 113, 117 n.1 (2d Cir. 2004).  Since no party challenges that Plaintiff has adequately pleaded a disability under either the ADA or the NYSHRL, this distinction is not material to the Court's discussion.